## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CR-0196-02-CVE |
| | ) | |
| KALEB JERMAINE MYERS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is defendant Kaleb Jermaine Myers' Motion in Limine Regarding Expert

Opinion. Dkt. # 43. Defendant and co-defendant Julien Lee Hale were charged by indictment with

conspiracy to commit robbery (count one), robbery (counts two and four), and possession of a

firearm in furtherance of a crime of violence (counts three and five). Dkt. # 13. Defendant had

previously filed a motion requesting a Daubert[1] hearing as to whether the methodology utilized by

fingerprint examiner Michelle Gorges in comparing fingerprints is reliable. Dkt. # 28, at 4. The

government filed a response to the hearing request, detailing Gorges' qualifications and explaining

the methodology utilized by Gorges. Dkt. # 32. The Court granted the motion for a hearing, and

set the Daubert hearing to coincide with defendant's pretrial conference, and the hearing was held

on December 7, 2012. Thereafter, the motion in limine was filed.

## I.

At the hearing, defendant stated that his challenge was to the methodology utilized by

Gorges, and not to Gorges' qualifications as a fingerprint examiner. The parties stipulated that, in

---

[1]     Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

lieu of direct examination of Gorges by plaintiff, Gorges would testify as to the matters contained in the government's response to defendant's motion, Dkt. # 32, and the hearing proceeded with defense cross-examination of Gorges.  Gorges stated that she is a senior forensic scientist with the Tulsa Police Department (TPD) forensic lab.  Defendant questioned Gorges about the procedures used by the TPD in analyzing fingerprints.  Gorges stated that the TPD utilizes the ACE-V method. The four steps of the ACE-V method are: analysis, comparison, evaluation, and verification.

Gorges testified that the first step in the ACE-V method is to analyze the latent print, which is the print recovered from the crime scene.  Gorges amplifies the print and scans the print into a computer.  Gorges stated that there are not objective criteria for the quantity or quality of a latent print that an examiner must look to before deciding whether the latent print may be used for comparison.  Gorges sometimes also receives a suspect's name from a TPD officer.  If so, she will, after completing the analysis phase and deciding whether the latent print is one that can be used for comparison, retrieve the print card, if any, of the suspect.  Prints on a print card are referred to as "known" prints.  In the comparison step of the ACE-V method, Gorges analyzes the known print, and thereafter compares the known and latent prints.

Defendant asked Gorges about, and Gorges explained, the difference between distortions and dissimilarities.  If Gorges finds a distortion, she analyzes the print to determine the source of the distortion; but, she stated that finding a distortion does not necessarily lead to the conclusion that the latent print cannot be identified to the known print.   If, however, Gorges identifies a dissimilarity, Gorges concludes that the latent print cannot be individualized to a person or that a conclusive match has not been made.  Gorges testified that each examiner might identify different points and features of a print, and might approach the analysis of each print differently.  Gorges also

acknowledged that differentiating between dissimilarities and distortion is a subjective determination, although examiners use objective criteria. Gorges estimates that she has examined "hundreds of thousands" of fingerprints, and, from that large number of examinations as well as her training and experience, she believes that a trained fingerprint examiner could differentiate between a distortion and a dissimilarity with accuracy. Further, Gorges stated that if there is any unexplainable dissimilarity, the print is not individualized to a person. Therefore, Gorges stated that she is either one hundred percent confident in the identification made or she does not make an identification.

After analyzing both the latent and known print, in the evaluation phase, Gorges determines if the prints match such that she is positive the latent print is from the same person as the known print. Gorges stated that, in this case, the latent prints were so clear and of such high quality, that Gorges was one hundred percent confident that the identification was correct.

Finally, in the verification step, the prints, both known and latent, are reviewed by a second examiner. Because TPD employs only two examiners, the examiner verifying identifications made by Gorges is always the same examiner. Unlike some other laboratories, TPD utilizes both negative and positive verifications. In other words, both latent prints that can be individualized to, and identified with, a known print, and latent prints that cannot, are sent to a verifying examiner. The verifying examiner receives prints without markings or other result-oriented notations. Further, cases are chosen at random for blind verification, which means that the secondary examiner does not know the conclusion of the first examiner. In this case, defendant's prints were subjected to blind verification, and the secondary examiner reached the same conclusion as Gorges. Finally, Gorges stated that, when there are errors and misidentifications, the error is in the human application

of the methodology.  In other words, Gorges testified that the ACE-V method is entirely accurate; however, in its application, errors are possible.  Gorges further testified that a trained, competent examiner who follows the ACE-V method will not misidentify a print.

Gorges testified that, pursuant to TPD protocol, examiners are required to document each step of the ACE-V analysis, and that she did document each step in this case. Upon questioning regarding TPD procedures, Gorges stated that examiners are allowed to consult with each other, including the verifying examiner, during the original ACE-V analysis; however, any consultation would be regarding something minor, including the positioning of the print, rather than the ultimate outcome of the determination.  Further, Gorges testified that she did not consult with the verifying examiner during her analysis of the fingerprints in this case.  Gorges stated that the Federal Bureau of Investigation (FBI) utilizes the ACE-V method, and that the ACE-V method is the most reliable method of fingerprint identification.  After the hearing, defendant filed the motion in limine on the ground that, because Gorges testified that application of the ACE-V methodology necessarily introduces human error, ACE-V cannot be one-hundred percent reliable, and therefore Gorges should be prohibited from testifying regarding her opinion that latent prints match known prints or her confidence in the match.  Dkt. # 43.

## II.

Pursuant to Federal Rule of Evidence 702, "[e]xpert testimony is admissible only if it is potentially helpful to the jury and '(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case.'" United States v. Baines, 573 F.3d 979, 985 (10th Cir. 2009) (citing Fed. R. Evid. 702).  The Supreme Court, in Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579 (1993), suggested factors to guide "trial courts in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." Baines, 573 F.3d at 985 (citing Daubert, 509 U.S. at 593-94). The Daubert inquiry is "flexible," and the district court does not need to consider every Daubert factor. Id. at 989-90; see also Bitler v. A.O. Smith. Corp., 400 F.3d 1227, 1233 (10th Cir. 2004) ("[T]his list is neither definitive nor exhaustive and [ ] a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability." (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999))).

Further, "the trial court's gatekeeping function applies to all expert testimony . . . there is no clear line separating 'scientific' knowledge from technical knowledge. Id. at 990. "[F]ingerprint analysis is best described as an area of technical rather than scientific knowledge." Id. (citations omitted). Therefore, "some of the *Daubert* factors may be less helpful [because] the evidence under consideration is not scientific in the strict sense."

The Tenth Circuit has found that fingerprint comparison is reliable and admissible. Id. at 989-92; see also United States v. Avitia-Guillen, 680 F.3d 1253 (10th Cir. 2012) ("Fingerprint comparison is a well-established method of identifying persons, and one we have upheld against a *Daubert* challenge." (citation omitted)). The ACE-V methodology was examined by the Tenth Circuit in Baines, and the circuit court found, after weighing the factors set forth by the Supreme

Court in Daubert, that the record supported the admissibility of the fingerprint identification in that case.  Id. at 989-993.

Although not a "definitive checklist or test," the factors enumerated in Daubert are helpful in assessing the reliability of an expert and of that expert's methodology.  See Kumho Tire Co., 526 U.S. at 150.  The first Daubert factor is whether the theory has been tested.  Gorges noted that several recent studies have been published regarding the rate of error in fingerprint analysis. Additionally, although not testing in the strictly scientific sense, Gorges undergoes annual proficiency tests and training throughout the year.  Although the training and proficiency testing are not "testing that would meet all of the standards of science, it would be unrealistic in the extreme for [the Court] to ignore the countervailing evidence."  Baines, 573 F.3d at 990.  As the Tenth Circuit noted in Baines, "proficiency examinations have been criticized on several grounds, most notably that they do not accurately represent conditions encountered in the field."  Id.  But, the circuit court also noted that it saw "no basis . . . for totally disregarding these proficiency tests."  Id. Defendant questioned whether the proficiency testing that Gorges undergoes on an annual basis truly approximates fingerprint analysis that she is required to do outside of the testing situation. However, the Court finds that Gorges has "undergone demanding training culminating in proficiency examinations, followed by further proficiency examinations at regular intervals during [her] career[ ]." Id.  Thus, Gorges' testing is commensurate with the training undergone by fingerprint analysts employed by the FBI and other "law enforcement agencies all over the world," and is sufficient to weight the first Daubert factor in favor of admissibility.  Id.  Therefore, the Court finds that the first Daubert factor weighs in favor of admissibility.

The second factor enumerated in <u>Daubert</u> is whether the methodology has been subjected to peer review and publication.  Defendant attached to his motion an Office of the Inspector General (OIG) report entitled: A Review of the FBI's Progress in Responding to the Recommendations in the Office of the Inspector General Report on the Fingerprint Misidentification in the Brandon Mayfield Case ("report").  Dkt. # 28, at 4; Dkt. # 28-1.  The report is an updated analysis of the FBI's fingerprint identification procedures.  After a fingerprint was misidentified as belonging to Brandon Mayfield in 2004, the OIG issued a report with recommendations to the FBI laboratory regarding its fingerprint analysis procedures, and the report was specifically aimed at the shortcomings which led to the misidentification.  The 2011 version of the report, attached to defendant's motion, was released in June 2011 (Dkt. # 28-1, at 1), and it effectively states that the FBI laboratory has satisfactorily implemented all recommendations or has otherwise implemented measures designed to correct the problems in the fingerprint analysis that led to the Mayfield misidentification.  The OIG report listed eighteen recommendations to the FBI laboratory.  Seventeen are listed as "closed," with notations that the FBI has significantly improved in many of the previously problematic areas. Dkt. # 28-1, at 24, 44, 47 (examples of recommendations closed because of significant improvement or progress).  One recommendation has not been closed because a review by the Department of Justice Criminal Division is still pending, but the OIG suspects it will soon be listed as closed.  <u>Id.</u> at 24, 53-54.  Although the peer review contained in the report is not strictly scientific peer review of the ACE-V methodology contemplated by "independent peer review of true science," <u>Baines</u>, 573 F.3d at 990, it is sufficient to lend credibility to the methodology.  Gorges also testified that, pursuant to TPD protocol, both positive and negative identifications are subject to verification. Again, although review by a secondary examiner is not the "independent peer review of true

science," id., it again lends credibility to the ACE-V methodology, especially where the review is sometimes blindly done.   Therefore, the second Daubert factor weighs slightly in favor of admissibility.

The third Daubert factor is whether there is a known or potential rate of error.  Gorges testified that she did not know the exact the rate of error in fingerprint analysis, but that papers have been published regarding how often prints are misidentified.  Further, Gorges testified that ACE-V is free of any error, but that the scientists applying the ACE-V method may make errors.  However, Gorges stated that a trained, competent examiner using the ACE-V method properly should not make a misidentification.  Therefore, this factor also weighs slightly in favor of admissibility.

The fourth factor enumerated in Daubert is the existence and maintenance of standards controlling the technique's operation.  As the Tenth Circuit found in Baines, 573 F.3d at 991, and as Gorges testified, several steps of the analysis require subjective judgments.  Although "subjectivity does not, in itself, preclude a finding of reliability," the reliance on subjective judgments may weigh against admissibility.  Id.  However, Gorges also testified that the extensive training and testing that she undergoes makes the subjective analysis more exacting.  When defendant asked whether two examiners might view the print differently or examine a print differently in the analysis step, Gorges stated that, while two examiners might notice different areas of the print, an examiner following the standard operating procedures, or the ACE-V method in the TPD, would not have "a lot of leeway."  Therefore, the fourth factor weighs both for and against admissibility.

The final factor is whether the method has achieved general acceptance in the relevant scientific or expert community.  Gorges testified that ACE-V is currently utilized by the FBI.  She

also stated that it is the most reliable standard or protocol. Because fingerprint analysis has achieved "overwhelming acceptance" by experts in Gorges' field, id., and because ACE-V is accepted as the most reliable methodology, this final factor weighs in favor of admissibility.

The Court therefore finds that Gorges' testimony is based upon sufficient data and is the product of reliable principles and methods. Fed. R. Evid. 702. Because the overwhelming weight of the Daubert factors weigh in favor of admissibility, the Court finds that the ACE-V method utilized by Gorges is reliable and that the motion in limine should be denied.[2]

**IT IS THEREFORE ORDERED** that the methodology utilized by fingerprint examiner Michelle Gorges in individualizing prints to defendant is reliable and, therefore, Gorges' testimony regarding fingerprint comparison is admissible, pursuant to Fed. R. Evid. 702.

**IT IS FURTHER ORDERED** that defendant's Motion in Limine Regarding Expert Opinion (Dkt. # 43) is **denied.**

**DATED** this 11th day of December, 2012.

_Claire V Eagl_

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[2] The Court notes that defendant's motion in limine does not raise any substantially new issues than were raised in the Daubert hearing. Defendant is free to cross-examine Gorges regarding any factors that might detract from her confidence in the match in this case.